MIRIAM BERGER

*v.*

THE UNITED STATES STEEL CORPORATION et al.

[Filed August 2d, 1902.]

1. The Corporation act (act of 1896) in force when defendant was organized, authorized (section 29) the reduction of capital stock (1) by retiring or reducing any class of the stock, (2) by drawing the necessary number of shares by lot for retirement, (3) by the surrender by every stockholder of his shares and the issue to him in lieu thereof of a de-

Berger *v.* U. S. Steel Corporation.

creased number of shares, (4) by the purchase at not above par of certain shares for retirement, (5) by retiring shares owned by the corporation, or (6) by reducing the par value of shares. Defendants' capital stock consisted of eleven million shares ($100 par value) equally divided between preferred and common stock, and a resolution was passed by the directors and stockholders "that to the extent that holders consent thereto, two million shares of the preferred stock of the corporation now outstanding shall be redeemed and retired out of bonds or of the proceeds of bonds of the company, which bonds shall be of the character described," &c. By the plan, set out in other resolutions adopted at the same time, an opportunity to subscribe *pro rata* for the bonds was to be made to the stockholders on behalf of the company, by J. P. Morgan & Co., bankers, pursuant to a contract called the bankers' contract, the subscription to be payable in preferred stock at par. The bankers, by the contract, had the option to take within a certain time all or any of the bonds not subscribed for, and to pay for them in preferred stock. They guaranteed that at least $80,000,000 of these bonds would be subscribed for. For the guaranty and their services, compensation at four per cent. of the amount subscribed was to be allowed.—*Held*, (1) that the plan of converting stock into bonds was, in substance, as well as in form, a general reduction of the capital of the company, and a division of the assets made available by the general reduction among the stockholders. It was therefore a reduction made by reducing a class of the stock, the *first* method designated in section 29, and was not a "purchase at not above par of certain shares for retirement," the *fourth* method; (2) the purchase of shares for retirement may effect a preference to the stockholder whose shares are purchased, and as this affects the relations of the stockholders *inter sese*, the construction of the clause should be strict, in order to preserve these rights. The clause should be construed to apply to the purchase of specified or designated shares, and not to a general reduction of an entire class of stock; (3) the division of assets on a general reduction of stock, under the *first* method, must be equal among all the stockholders of the class, and it is compulsory. The right of each stockholder in the assets on such distribution is a vested property right, and his share, either in the bonds or proceeds, must be given to or held for him by the company, and his refusal or failure to accept the offer to subscribe for the bonds does not authorize the company to give any other stockholder the right or option to take his share. The giving of such option created a preferential distribution of the assets, and the plan is therefore illegal.

2. An act passed March 28th, 1902 (*P. L. of 1902 p. 217*), authorized corporations having certain characteristics (which the company was admitted to have) with "the consent of the holder of any of its preferred stock, to redeem and retire the preferred stock of such holder, out of the bonds or out of the proceeds of bonds of the company.—*Held*, (4) this act authorized a preferential selection of stock for redemption, such as the plan in question contemplated, but as the right of selection impaired the right to equal distribution on a general reduction of stock, existing under the charter of the company, it was unconstitutional as against a dissenting stockholder of the company.

Berger *v.* U. S. Steel Corporation.

On bill for injunction and application for preliminary injunction. Heard on bill and affidavits, and answer and affidavits.

Complainant is the holder of one hundred and sixteen shares of the preferred stock of the United States Steel Corporation, of which she became the owner in November, 1901, and for which she paid $10,759. The stock was transferred to her and stands in her name on the company's books, and she has since received the regular quarterly dividends declared thereon. The United States Steel Corporation was organized February 25th, 1901, under the General Corporation act, and by its original certificate, filed on that day, and its amended certificate, filed April 1st, 1901, had an authorized capital stock of $1,100,000,000, divided into eleven million shares of $100 each, equally divided, as to number and amount, between preferred and common stock. By the amended certificate (article 4) it was provided that

"the holders of the preferred stock shall be entitled to receive, when and as declared, from the surplus or net profits of the corporation, yearly dividends at the rate of seven per cent. per annum and no more, payable quarterly on dates to be fixed by the by-laws. The dividends on the preferred stock shall be cumulative, and shall be payable before any dividend on the common stock shall be paid or set apart, so that if any year, dividends amounting to seven per cent. shall not have been paid thereon, the deficiency shall be payable before any dividends shall be paid upon or set apart for the common stock."

And as to the rights on winding up, it was also, by the same article 4, provided:

"In the event of any liquidation or dissolution or winding up (whether voluntary or involuntary) of the corporation, the holders of the preferred stock shall be entitled to be paid in full both the par amount of their shares and the unpaid dividends accrued thereon, before any amount shall be paid to the holders of the common stock."

On March 28th, 1902, an act amending the General Corporation act of 1896 was approved (*P. L. of 1902 p. 217 ch. 58*), the second section of which provided for the conversion of preferred stock into bonds, as follows:

Berger *v.* U. S. Steel Corporation.

"2. With the consent of two-thirds in interest of each class of stock-holders present in person or by proxy at a meeting called in the manner provided in section 27, every corporation organized under this act that shall have issued preferred stock, entitling the holders thereof to receive dividends at a rate exceeding five per centum per annum, and that shall have continuously declared and paid dividends at such rate, on such preferred stock, for the period of at least one year next preceding the meeting, and whose floating or unfunded debt at the time of the stockholders' meeting shall, in the certificate thereof filed with the secretary of state, be certified not to exceed ten per centum of the par amount of the preferred stock then outstanding, and whose assets at such time, after deducting the amount of its indebtedness, shall be certified in the judgment of the officers making such certificate to be at least equal to the amount of preferred stock issued and outstanding, may, with the consent of the holder of any such preferred stock, redeem and retire the preferred stock of such holder, out of the bonds or out of the proceeds of bonds of the corporation, bearing interest at a rate not exceeding five per centum per annum, the principal of such bonds being made payable at a date not less than ten years from the date thereof, every corporation organized under this act may, from time to time, in the manner above provided, issue bonds, which, if therein so declared, shall be convertible at par at the option of the holder, into fully-paid common stock of the corporation, at par, within any period therein prescribed, not less than two years from the issue thereof, and in such case the board of directors may authorize the issue of the common stock into which such bonds, by their terms, shall be convertible."

The bill charges (paragraph 4) that the directors and managers of the United States Steel Corporation procured this law to be passed in order to enable some of them to make an enormous commission in a scheme to convert a large block of the preferred stock of the company into bonds. The answer (paragraph 1) admits the allegation as to procuring the act to be passed, but denies the object and purpose charged. On April 1st, 1902, the board of directors adopted a series of resolutions, *five* in number, by the *first* of which it was

"*Resolved,* That the United States Steel Corporation hereby accepts and approves the provisions of the act approved March 28th, 1902 [describing it by its title], and particularly the second section of said act permitting and providing for the redemption and retirement of the preferred stock out of bonds or the proceeds of bonds."

The *second* resolution of the series declared that the board deemed it, and thereby declared it to be, advisable

"that to the extent that holders thereof shall consent thereto, 2,000,000 shares of the preferred stock of the corporation now outstanding shall be redeemed and be retired out of bonds or out of the proceeds of bonds of the United States Steel Corporation, which bonds shall be of the character set forth in the next resolution."

The *third* resolution provided that the bonds bear interest at five per cent., payable semi-annually, payable in sixty years and redeemable at $100, after ten years, out of a sinking fund to be provided, or any other funds of the corporation. The bonds to be issued for retiring stock were to be part of a total issue of $250,000,000, and secured by mortgage, lien and pledge on all of the present and future property of the corporation and shares it held in other corporations (except directors qualifying shares), the lien and pledge to be similar to the first mortgage lien of $304,000,000. Reasonable opportunity was to be given to the preferred stockholders of record on a date to be fixed in the offer to subscribe for their ratable share of $200,000,000 of the bonds, payable in the preferred stock at par, and being forty per cent. of their several holdings, and to subscribe ratably for $50,000,000 of the bonds, being ten per cent. of their holdings and payable in cash. By the *fourth* resolution it was provided bonds not exceeding $50,000,000 of this character and so secured should be sold for cash, for the corporate purposes of the corporation, whether the stockholders approved the resolution for the retirement of the preferred stock or not. The *fifth* resolution, closing the series (excepting a resolution calling a special meeting of the stockholders), provided, so far as yet disclosed, the practical plan for carrying into effect the resolution of the directors advising the retirement of preferred stock out of bonds or the proceeds of bonds. This resolution directed and authorized the president and secretary of the corporation to enter into a contract, dated April 1st, 1902, with the bankers, Messrs. J. P. Morgan & Company, substantially in the form annexed to the resolution. The contract was to be executed forthwith, but not finally to become or be operative until after approval thereof by the stockholders in special meeting assembled. This contract, which may be called the "bankers' contract," was a contract between the company and the bankers,

and, after reciting at length the resolutions of the. directors above referred to, declared that, in anticipation of the stockholders' approval and ratification of the resolutions, and depending such approval and ratification, the parties had therefore "entered into arrangements substantially such as are hereinafter set forth in the contract, for the accomplishment of the purposes of said resolutions." The contract contains two articles—article first, relating to the issue of $200,000,000 for stock, in connection with the $50,000,000 for cash; article second, relating to the $50,000,000 for cash issue alone.

Article first contains five sections, and is the plan which, as the contract recites, is for the accomplishment of the resolutions of the directors, the declared purpose, it will be observed, being to redeem the stock out of bonds or out of the proceeds of bonds. The first section of article first contains the offer which the bankers, "for account of and on behalf of the steel company," is to make to the preferred stockholders of the company. This offer is twofold—(1) the preferential right to subscribe to the bonds, to the extent of forty per cent. of their holdings, payable in preferred stock at par, and the bankers may, at their discretion, allow a subscription for more than forty per cent. of the holdings, thus giving them or their appointees that preference in subscription; and (2) the right to make an additional subscription for bonds at par, to the extent of ten per cent. of the stock. The offer is to be open for thirty days after a date fixed, and, to the extent that it is accepted, the steel company is to deliver bonds to the bankers to enable them to fulfill the terms and conditions of their offer. The delivery of bonds by the company to the bankers is, however (section 2, article 1), to be made "upon the terms and conditions of such offer and in fulfilment thereof," and the delivery is declared to be made to the bankers to enable them to fulfil the terms of their offer as so accepted. The terms and conditions of this offer by the bankers, the agents acting on behalf of the company, have not been disclosed, nor has the circular been submitted. Nor does it appear whether the terms and conditions upon which the offer is to be made by the company (through the bankers, as its agents for that purpose) to its stockholders is known to the directors,

and officers of the company, acting in its behalf in the formal execution of the contract, but it must be presumed that it was, and is, known, for the contract between the company and the bankers, when operative, seems, by article 2, to commit the further terms and conditions of the offer to the bankers themselves, and to agree, in advance, that bonds shall be delivered to those who accept the terms and conditions of the offer.

The third section of article *First* is the portion of the bankers' contract which is the central feature of the plan, the feature which effectually restricts the operation of the directors' resolutions to one of the two plans of redeeming stock, viz., the redemption out of bonds, and is the feature of the plan which, at the same time, impairs, or is claimed to impair, a dissenting stockholder's property right. This section provides that if the offer to subscribe for bonds is not accepted to the full extent of $250,000,000, then the bankers are to have the option, until October 1st, 1903, of taking all or any of the bonds offered to stockholders and not subscribed for by them up to $200,000,000 for preferred stock and $50,000,000 for cash. The bankers' exclusive option, by this clause, extends over more than a year, and it extends to the whole amount the directors thought advisable to retire, either out of bonds or the proceeds of bonds. This option, if exercised to its full extent, may therefore result in placing ahead of the non-assenting stockholders' stock $200,000,000 bonds, secured by mortgage. The next section—*Fourth*—fixes the minimum limit of the conversion, so far at least as it can be fixed by a guaranty. The bankers' guaranty that offers of subscriptions shall be made and performed, "upon the terms and conditions thereof" (that is, as I read the contract, the terms and conditions which they themselves are apt to make thereafter by their circular), to at least $100,000,000 of bonds at par, $80,000,000 payable in preferred stock at par and $20,000,000 in cash. The time when the bankers' contract is to become operative and enforceable, as to the $200,000,000 to be issued for stock, is fixed, by the last clause of article *Fifth,* and is declared to be

"as soon as, and not before, the proposed retirement of 2,000,000 shares of preferred stock, by the issue of bonds, shall have received the assent of stockholders and shall have been finally authorized in the manner provided by law."

Article *Second* of the contract relates to the subscriptions for bonds that are to be issued for cash. As to these bonds, which are issued for the corporate purposes of the company, the putting in of more money, on either stock or bonds, being clearly a matter of consent, the stockholder's right can only be preferential, and, not having been exercised, terminates, and no objection has been made to this article, which takes effect on the approval of the stockholders; the further qualification added to the first article, "and shall have been finally authorized in the manner provided by law," being omitted.

Article *Third* of the contract fixes the bankers' compensation for the risk, guaranty and obligation under the first two articles at a commission equal to four per cent. upon all bonds sold and delivered to the stockholders or to the bankers and their associates. Article *Fourth* provides for fixing the compensation of the bankers on the bonds issued for cash, in case the stockholders declined to authorize the offer for bonds. The *Fifth* article relates to the approval by the bankers of the form of the bonds and mortgage, and the *Sixth* article provides for the formation of a syndicate by the bankers to assist in carrying out the agreement, and article *Seventh* provides for the amendment of the agreement and the extension of time under it by the bankers and by the steel corporation, through its board of directors or finance committee.

Notice of a special meeting of the stockholders was duly given for May 19th, 1902, to take action upon each of four resolutions of the directors, relating to the redemption and retirement of the stock, the issuing of bonds and approving the bankers' contract, which, in the notice, was described as providing

"for the public offer by them (J. P. Morgan & Co.) to the preferred stockholders of such bonds and for the acquisition by them of such bonds, as preferred stockholders, all as set forth in said contract,"

and copies of the resolution and contract were declared to be obtainable at the company's office, and the notice contained copies of the directors' resolutions.

At the special meeting of the stockholders held May 19th,

1902, the stockholders, by a vote of three million seven hundred and forty-five thousand seven hundred and thirty-one shares of preferred stock and three million nine hundred and fifty-eight thousand five hundred and fifty-seven shares of common stock in favor of the resolutions, and four thousand eight hundred and sixty-five shares of preferred stock and seven thousand six hundred and seventy-five shares of common stock against each and every of the resolutions, adopted resolutions as follows: (1) They approved and ratified the action of the directors, as set forth in their resolutions; (2) they consented that, to the extent holders consented, two million shares of the preferred stock should be retired out of bonds or the proceeds of bonds; (3) authorized the issue of bonds for $250,000,000—$200,000,000 payable in preferred stock and $50,000,000 payable in cash; (4) authorized the issue and sale, for cash, of $50,000,000 bonds for the corporate purposes of the corporation; (5) authorized and confirmed the bankers' contract for the acquisition of bonds not taken by stockholders and the terms and compensation fixed by the contract.

Complainant's proxy attended the meeting and voted against the resolutions, and protested specially against the third resolution, authorizing the issue of $200,000,000 bonds for preferred stock.

Complainant seeks to enjoin the issue of these bonds to retire the preferred stock in the manner proposed, upon the special grounds (1) that, if carried out, it impairs her vested right as a stockholder; (2) that the plan or scheme for conversion of stock into bonds is unconstitutional, *ultra vires* and void, as against complainant and dissenting stockholders; (3) that the execution of the plan will imperil complainant's stock, be ruinous and disastrous to the company, and (4) that at least four members of the bankers are directors of the corporation, and that the compensation of $8,000,000, which may be received by the bankers, is without compensation and illegal, and that the scheme is devised to secure exorbitant commissions by its firm. An injunction against both the corporation and the bankers, preventing the execution of the plan, is prayed, and also general relief.

The answer of the defendant corporation denies that the vested

and contractual rights of the complainant are correctly set out in her bill, admits complainant's opposition to the execution of the plan for conversion of the stock and the execution of the bankers' contract. As to complainant's objection to this contract, based on the fact that members of the bankers' firm were also directors of the company, the corporation sets up (answer, paragraph 3, section 5) a by-law of the company—section 9.—duly adopted under the Corporation act in force since April 1st, 1901, with the consent of every stockholder, expressly permitting contracts to be made by the board of directors, where any director is personally interested, provided the contract be approved by an affirmative vote of at least ten directors not so interested, the entire board at the time of the making of the contract being present. The same by-law also provides that any such contract may be submitted to the stockholders at its annual or a special meeting called for the purpose, and if then approved by a majority of the stockholders present, shall be as binding as if approved by all. The contract in question has been so approved and ratified, on this vote of the stockholders about seven-tenths of the entire stock, exclusive of the stock held by the bankers or the syndicate, voted in favor of the contract. As to the unreasonableness of the amount of compensation to the bankers, the answer and affidavits set up circumstances showing its reasonableness, and that the payment of the entire compensation on the bonds issued for conversion may, under certain conditions, be lost. The answer further sets up that the syndicate formed under the contract have deposited with the bankers preferred stock for conversion to the amount of $80,000,000 par value, in order to be able to carry out the contract. The answer (paragraph 8) further declares that this bankers' contract is subject to modification.

As to the effect upon the value of complainant's stock of carrying the plan for conversion into effect, the answer, with the accompanying affidavits and exhibits, sets up the proceeding and reports of its different committees and officers to whom the investigation of the matter, in its business aspects, was committed, and (paragraph 11) that the entire action and proceedings of the board were taken and are intended to be consummated

in good faith and in the exercise of their best and unanimous judgment as to the best interests of the corporation, and that it has been approved by the holders of more than three-fourths in interest of the entire capital stock.

As to the main question at issue, the effect upon the complainant's vested and contractual rights of carrying out the proposed plan of conversion against her consent, the defendant denies that these rights of complainant's are as set out in the bill, and insists (paragraph 10) that the action now questioned was duly and constitutionally authorized by the laws of New Jersey, by the certificate of incorporation and by-laws of the company and by the contract between all the shareholders of the corporation. The powers in the certificate and by-laws, which are relied on to sustain the action, are, as set out in paragraph 9 of the answer, the power (1) to retire the whole or any part of its stock, (2) to issue bonds, (3) to dissolve and, in connection therewith, provide for payment of debts, and then pay off preferred stock to the exclusion of common, and (4) to alter and amend its certificate in any manner and to any extent deemed advisable by the directors and assented to by the holders of two-thirds of the capital stock of both classes present at a meeting. These provisions of the certificate and by-laws, together with such other provisions of either as were relied on in the arguments or briefs, are as follows, as referring to the subject in hand:

*Amended Certificate, Article 3.*—"Without in any particular limiting any of the objects and powers of the corporation, it is hereby expressly declared and provided that the corporation shall have power to issue bonds and other obligations in payment for the property purchased or acquired by it, or for any other object in or about its business; to mortgage or pledge any stocks, bonds or other obligations or any property which may be acquired by it, to secure any bonds or other obligations by it issued or incurred; to guarantee any dividends or bonds or contracts or other obligations; to make and perform contracts of any kind and description, and in carrying on its business, or for the purpose of attaining or furthering any of its objects, to do any and all other acts and things, and to exercise any and all other powers which a copartnership or natural person could do and exercise, and which now or hereafter may be authorized by law."

*Ibid., Article 7* (the article relating to directors).—"Unless authorized by votes given in person or by proxy, by stockholders holding at least

two-thirds of the capital stock of the corporation which is represented and voted upon in person or by proxy at a meeting specially called for that purpose, or an annual meeting, the board of directors shall not mortgage or pledge any of its real property, or any shares of the capital stock of any other corporation."

*Ibid., same Article 7.*—"The board of directors may determine and vary the amount of the working capital and direct the use of surplus or net profits above capital stock paid in, and in its discretion the board of directors may use and apply any such surplus or accumulated profits in purchasing or acquiring its bonds or other obligations, or shares of its own capital stock, to such extent and in such manner and upon such terms as the board of directors shall deem expedient, but shares of such capital stock so purchased or acquired may be resold, unless such shares shall have been retired for the purpose of decreasing the company's capital stock, as provided by law."

By-laws, section 1 and section 9, relating to contracts in which directors are personally interested, are set out in the answer, paragraph 3, section 5.

The provisions of the constitution and the laws of the state in force previous to the act of 1902, referred to in the arguments as bearing upon the question, are constitution, article 4, section 7, paragraph 11, prohibiting special acts conferring corporate powers, directing general laws for organizing corporations and obtaining corporate power, "subject, nevertheless, to repeal or alteration at the will of the legislature."

Corporation act, section 1, paragraph 4, declaring powers of every corporation, including power to mortgage real or personal estate with its franchises, and to make by-laws "providing for the management of its property, the regulation and government of its affairs," &c.

*Ibid.,* section 2, declaring that every corporation, their officers and stockholders, in addition to the powers enumerated in the first section and the powers specified in their charter or certificate of incorporation, should possess and exercise all the powers and privileges contained in the act, so far as necessary or convenient to attain the objects set forth in the charter or certificate, and being governed by the provisions and subject to the restrictions and liabilities in the act contained, so far as appropriate and not inconsistent with the charter or act of incorporation, and that no corporation should possess or exercise any other corporate

powers, except such incidental powers as should be necessary to the exercise of the powers so given.

*Ibid., Section 4.*—"That the charter of every corporation, or any supplement or amendment, shall be subject to alteration, suspension and repeal, in the discretion of the legislature."

*Ibid., Section 5.*—"That this act may be amended or repealed, at the pleasure of the legislature, and every corporation created under this act shall be bound by such amendment, but such amendment or repeal shall not take away or impair any remedy against such corporation or its officers, for any liability which shall have been previously incurred; this act, and all amendments thereof, shall be a part of the charter of every corporation heretofore or hereafter formed hereunder, except so far as the same are inapplicable to the objects of such corporation."

The above provisions, except section 5, are general provisions applicable to all corporations, whether organized under the act or otherwise, and the provisions of the Corporation act relating to corporations organized under it, applicable or claimed to be applicable, are as follows:

*Ibid.,* section 8, paragraph 7, authorizing the certificate to contain any provisions which the incorporators choose to insert for regulating its business and conducting its affairs,

"and any provision creating, defining, limiting and regulating the powers of the corporation. the directors and the stockholders, or any class or classes of stockholders; *provided,* such provision be not inconsistent with this act."

Section 11, declaring the power to make by-laws to be in the stockholders, by authorizing the corporation, in its certificate, to confer that power upon the directors, and that by-laws made by directors, under this power, might be altered or repealed by the stockholders.  Section 12, directing that the business of the corporation should be managed by the directors.  Section 18, authorizing the creation of common and preferred stock.  Section 27, authorizing decrease of capital stock.  Section 29, as to methods of decreasing capital stock.  Section 30, as to withdrawing any part of the capital stock or reducing it, except from surplus or net profits.

Section 29, relating to the methods of decreasing capital stock, is as follows:

"The decrease of capital stock may be affected by retiring or reducing any class of the stock, or by drawing the necessary numbers of shares by lot for retirement, or by the surrender of every shareholder of his shares and the issue to him in lieu thereof, of a decreased number of shares, or by the purchase, at not above par, of certain shares for retirement, or by retiring shares owned by the corporation or by reducing the par value of shares."

*Mr. Robert H. McCarter,* and *Mr. William J. Woods* (of the New York bar), for the complainant.

*Mr. Richard V. Lindabury,* with *Mr. Guthrie* and *Mr. Stetson* (of the New York bar), for the defendants.

EMERY, V. C. (after statement of case).

Upon the questions which are necessary and material to be decided on the application for preliminary injunction I reach the following conclusions:

*First.* The reasonableness or judiciousness, in its business aspect, of a reduction of the preferred stock of the steel corporation, and the distribution of capital resulting therefrom, by the conversion of stock into bonds, is, upon the facts now presented, altogether a matter of management of the affairs of the corporation, upon which the decision of the directors and stockholders, given in the manner required by law, is final, so far as relates to its business aspects. As to its business aspects, I may further say that the plan for a conversion has been matured after most careful deliberation by business men and has been approved by a very large proportion of the stockholders of the corporation—being as large as six hundred to one; and as the question of conversion relates to the management and disposition of the assets of a purely business corporation, the execution of the plan now proposed to be carried out should not be interfered with, on the opposition of a non-assenting stockholder, except upon the ground that the plan is illegal, and is clearly illegal.

*Second.* Under the laws of the State of New Jersey, at the time of the issuance of the preferred stock of the steel corporation, and up to the time of the approval of the act of March 28th, 1902, amending the General Corporation act, the steel

corporation had no authority, against the consent of any holder of preferred stock, to carry out the plan now proposed for reduction of its preferred stock, and the distribution of capital arising therefrom, for the reason that it is a preferential distribution of capital among some of these holders to the exclusion of others, and not a plan for an equal ratable distribution among all the preferred stockholders. This results from the facts that the amount of reduction by the plan proposed in the bankers' contract is necessarily connected with the distribution of the capital released for distribution by the reduction. The capital represented by preferred stock, up to a limit of $200,000,000, is to be reduced to the extent the holders agree to take bonds, and the distribution of the amount released is made solely among those who consent to take bonds. The stock of all those who decline to take bonds is thus made subject to the prior claim and lien of those who take bonds. This leaves, as the necessary result of the whole transaction, a preferential distribution of capital among those who were originally equal. It is claimed, on behalf of the defendants, that the preferential distribution is valid against complainant, because it was authorized by the laws in force at the time of the issuing of her stock. The consideration of the question of the extent of such authority, before the law of 1902, is necessary for this reason and for the additional reason that, on the hearing before me, all of the counsel of defendants expressly claimed that the act of 1902 was not the sole authority upon which the plan depended. Their contention in this respect was that the scope and effect of the law of 1902 was to expressly authorize a conversion of stock into bonds to be made directly, or by "short cut," as it was called, instead of leaving the same result to be accomplished by the exercise of other powers which the company had at the issuance of the stock. This view of the act of 1902, if well founded, may put it under the ban of being unconstitutional as special legislation, for the act confers this "short cut" privilege or power only upon a special class of corporations, and if all corporations had, and still have, after the act of 1902, the same power of conversion by indirect methods, there would seem to be no possible basis of classification which should exclude any corporation from the equal privilege of the

direct or "short cut" method, and the act would therefore be unconstitutional as special legislation. I do not agree with this view of the reach of the act of 1902, one reason being that the mere enactment, if the law is valid at all for any purpose, is of itself necessarily to be interpreted as a legislative declaration, of more or less weight, bearing on the question whether the power did exist before the act. Direct legislative authority for conversion *eo nomine* did not exist previous to 1902, and powers for conversion of stock into bonds relied on as existing at the time the preferred stock was originally issued are (1) the power of a corporation to purchase its own stock and, as connected with such purchase, to give bonds or mortgages, and (2) its power, under section 29 of the Corporation act, "to purchase certain shares for retirement at a price not above par," as one method of decreasing capital stock. In *Chapman* v. *Iron Clad, &c., Co., 33 Vr. 497 (Supreme Court, 1898)*, it was decided that a corporation, where its purposes require it, has the power to purchase its own stock and that, after such purchase, it continues to hold its own stock as property. But the kind of purchase here referred to is clearly the purchase made by the directors or other proper officers of the company, in the management of the business of the company, and is a purchase made on behalf of the company for the purpose of afterwards holding it as its property. As to a purchase of stock for the purpose of retirement, under section 29, this is also a purchase by the directors or officers acting for the company (for which the express previous direction or subsequent approval of the stockholders may be necessary), and it is a purchase only of "certain"—that is, as it strikes me, "designated" or "specified" shares. Purchases under both of these powers are necessarily exercises of the powers of directors to purchase, and are special and limited purchases, and it would be taking altogether too narrow a view of the matter now in hand to treat the present transaction as the exercise of either of these powers of the directors or of the company. The subject now dealt with is the readjustment, as between the stockholders themselves, and by the stockholders as such, of their previous relations to and rights in the assets or capital of the corporation. It involves an absolute change of their previous *status,* by changing

stockholders to creditors; it involves a lien upon the entire assets
of the corporation, subject to the first mortgage (about one-
fourth of the par value of the entire stock, preferred and com-
mon), and it reaches, or may reach, two-fifths of the preferred
stock, being about one-fourth (par value) of the assets above
the first mortgage. The conversion, *ipso facto,* makes, and in-
deed is, a reduction of capital and a distribution of the amount
made available for the reduction. And the transaction was,
moreover, a business undertaken by stockholders, as such, at a
general meeting, at which three-fourths or more in value were
represented. Can it be considered that a readjustment of rights
in capital of this general character and wide scope and effect,
directed and ordered by stockholders, in relation to its effect be-
tween themselves, was a transaction which was, or could be in its
essence, a purchase of stock *by the company,* under the special
and limited powers exercisable under existing laws? As a matter
of business fact, it was not the exercise of either of such pre-
existing powers of purchase, and that the stockholders who were
dealing with each other in relation to a readjustment of their
rights in the capital understood it was not such exercise, but the
exercise of another and distinct power of general conversion,
appears from the resolution, which expressed the form of their
action.

In the formal proceedings adopted to carry out the present
plan the *first* step of the stockholders was the formal approval
of the action of the directors in accepting the act of 1902, "and
particularly the second section of said act, permitting and pro-
viding for the redemption and retirement of the preferred stock
out of bonds or the proceeds of bonds," and the *second* step of
the stockholders was the consent that, to the extent that holders
should consent, two million shares of preferred stock be redeemed
and retired out of bonds or proceeds of bonds. These two steps
were the first and second resolutions adopted. These resolutions
expressed the business act of business men, who claimed, and
supposed, they had the right, under the act of 1902, to readjust
their relations as stockholders and to convert stock into bonds.
Surely it is idle to claim that this transaction, which was, in
fact, a conversion, and was understood at the time of the exer-

cise of the power to be a conversion, can now be considered as, in either form or substance, the exercise of the limited powers to purchase stock given under the general laws. Conversion of stock into bonds of this general character must depend upon express authority, and cannot be upheld by strained construction or combination of statutes giving powers for different purposes. If a stockholder had remained quiet until bonds were issued under the contract and were put on the market, an innocent bondholder might, perhaps, be expected to appeal to a court for his protection against a negligent stockholder, by giving these statutes and powers to purchase now relied on the strained construction now claimed. But the whole proceeding of issuing the bonds is still *in fieri,* the matter concerns only the right of stockholders themselves (for the bankers' contract, by its express terms, is not operative and enforceable in relation to these bonds until the bonds have been finally authorized in the manner provided by law), and the assenting stockholders and directors have hitherto claimed (or appeared to claim), in all their proceedings, that the bonds were issued under the act of 1902, and have directed the dissenting stockholder solely to that source of authority. The situation itself would seem to repel the suggestion that this is an occasion to modify the general rule that corporate powers must be clearly given, and to make, on the present claim, a new exception to the rule.

This power now claimed to exist previous to the act of 1902 extended, if it did exist, to common stock as well as preferred, for these statutes and powers relating to mere purchases make no discrimination. The courts should therefore, in my judgment, be inclined rather to the strictest construction in reference to the important power now claimed, and hold that, under these previous statutes, corporations organized under the general law do not have the general power of converting stock into bonds.

The central position of the defendants' case, as presented before me, and upon and about which their whole case turned, was that legally the transaction was a purchase of the stock. But, in form as well as in substance, this transaction is, in my opinion, not a purchase by the company of its stock as property, but is, in legal form as well as substance, a distribution of capital to

stockholders in discharge and satisfaction of their rights to distribution evidenced by the certificate. If a debtor received from his creditor his (the debtor's) note, upon delivering to the creditor a bond or chattel therefor, the debtor would, according to the nomenclature of legal forms applicable to transactions between natural persons, be said to have paid the note and discharged its obligations, and not to have purchased it. Using the language of legal form, the stock, on its exchange for bonds, is "redeemed and retired out of bonds," and, *ipso facto,* extinguished; it is not "purchased by the bonds" and continued as property. If the stock is not thus extinguished *ipso facto* on the exchange for bonds, and the stock, for any purpose, or to any extent, has, or can fairly be claimed to have, any validity or existence whatever after the exchange, the issue of the bonds and the placing of them on the public market should be enjoined. But the legal validity of this conversion cannot turn on the correctness or precision of the characterization of its legal form. The real intent of the whole legal forms and proceedings adopted is the only sure basis for decision.

The transaction being thus essentially a reduction of capital, in connection with a distribution among stockholders of the capital available, and being nothing else, the next question is what must be the character of such distribution. There are no statutes governing this subject of distribution, and, in their absence, an equal ratable distribution is the only one which can be made. The right to such equal ratable share in the capital, while it is being employed, and its distribution, when distribution is made, is an essential property right of a stockholder, and indeed it is the only essential right. It is the very right called his "share," and evidenced by his certificate. The right to his share of the dividends is due to his ownership of a share in the capital stock. And when the capital is available for distribution the stockholder's "share" entitles him to a share in that capital, as his property, which can no more be taken from him, without his consent, than can any other property.

If the steel corporation has the power to mortgage its assets for the purpose of raising the funds for distributing the assets available for general distribution among stockholders of a class

upon a reduction of stock, the distribution must be equal among all the stockholders of the class. This distribution of capital would be compulsory, and on refusal of a stockholder to accept his proportionate share, the corporation would still, notwithstanding his refusal, hold the funds as his funds, or owe him the amount, until it procured the surrender, by legal proceedings or otherwise, of the certificate of stock and paid his share. It may be that a stockholder thus entitled to a ratable share on distribution on a general reduction of stock could not be compelled, against his will, to accept, in lieu of his share of the funds raised by the mortgage, his proportionate share of bonds secured by the mortgage and payable at a future time, but his refusal to accept such distribution in lieu of cash could not be made the basis for depriving him of a ratable share of the funds available for distribution on a general reduction of the stock, or for releasing the corporation from its obligation to him for his share, or for allowing the payment of his share to another who would take bonds. If, on the reduction of stock, a distribution of capital in the form of bonds be legal, under the laws previous to the act of 1902, then the reduction authorized in the manner prescribed by the statute is compulsory and the distribution must be ratable and equal. On the refusal of a stockholder to take his proportionate share of the bonds, the company would continue to hold his share of the bonds for him, and dividends would cease to be payable on the stock so reduced. In the absence of statute authorizing a preferential distribution, the consent of stockholders to accept such bonds on a reduction of stock cannot be made the basis of the amount of the reduction of the stock, or of a plan to make a preferential distribution of assets among those who give such consents, and those only, on the theory that consents to accept the distribution in bonds of this character give the entire plan of reduction, in connection with the distribution of capital released thereby, the character of a purchase of the stock. Where capital is increased, the right of an existing stockholder is a preferential right only, a right to have the privilege to come in with more money. As he cannot be compelled to come in, the right cannot be other than a preferential right to come in, terminable when he refuses to increase his stock. But

when capital is released for distribution among existing stock-
holders, the situation, as to the effect of an offer, is essentially
different. His right to a share of the capital has, by reason of
its availability for distribution, now become a property right to
a share in that fund, of which he cannot be deprived without
his own consent. It is, in no sense, a preferential right to a share
in the division, so that he can be deprived of his property, if he
does not, within a certain time, or in a certain way, agree to it.
Nor does his refusal to take it within any time limit vest his
share in any other stockholder, or in the company, or in the
appointees of either. The refusal to accept his share no more
deprives him of his property right to it than the refusal of a
creditor to accept payment of a debt would pay the debt. The
legal defect in the plan set out in the bankers' contract is that
it proceeds upon the theory that a stockholder's right in distri-
bution either is, or can be made, by any form of contract or
proceeding directed by other stockholders, merely a preferential
right to take his share, and not a property right. The theory
is that if a stockholder does not assent to take the share which
the plan of distribution offers him, his right of property in his
share, or some interest in it, or charge on it, may, as a penalty
of this refusal, and through the form of a contract made by the
company, be taken by the assenting shareholders, or their ap-
pointees. This taking or impairment of the share of the non-
assenting shareholder, to the sole benefit of the assenting share-
holders, is, in fact, the final practical result—the real intent of
the execution of the plan. The plan, worked out to the end,
gives assenting stockholders, or their appointees, through the
form of a contract directed by the assenting stockholders them-
selves, an obligation of the company, secured by a lien on its
assets, which makes the assenting stockholders prior to all of
the stock of his former equal owner in the company's assets, the
non-assenting stockholder. No form of legal proceedings or of
contract between the company and the assenting stockholders,
whether it is the form of a contract or purchase of stock for
retirement, or any other form, should be allowed to bring about
this final result, and a court of equity, which looks behind and
through forms to the real essence of the entire transaction, in-

cluding the legal forms adopted, must deal with it according to its real intent. The plan, therefore, derives no validity or force from any powers which the company or the stockholders possessed before the act of 1902, and the next question is as to the effect of that act, which, in terms, expressly authorized a preferential distribution of assets. The conversion, under this act, may be made with any holder or any selected class of holders, and the principle of selection made by the bankers' contract is that of electing to take bonds.

*Third.* So far as the act of March 28th, 1902, authorizes, or purports to authorize, the redemption and retirement of a portion of the preferred stock of the steel corporation out of bonds as distinguished from the proceeds of bonds, under the plan proposed, it changes those proportionate property rights of the preferred stockholders, as between themselves, which existed at the date of the passage of the act, and impairs such property rights of the non-assenting stockholders to the benefit of the assenting stockholder who comes in under the plan. Those proportionate rights, as they then existed, were to share equally in the distribution of capital, and these were, in fact, the essential property rights evidenced by the certificate of stock.

Courts differ in their decision as to how far powers which are given to stockholders by the charter or certificates of the company, in relation to the management of the stock and which are incidental to the ownership of the stock, are subject to alteration and repeal by subsequent legislation. For instance, in regard to the relative voting rights, some courts hold that a change in the relative voting rights of stock is not a change in essential property rights. The case in the United States supreme court, upon which Judge Lacombe relied on deciding an application relating to this same plan of reduction, makes the clear and express distinction between the interference with a vested property right and the interference with a right which, although it may, to some extent, be of value in relation to giving the person a voice in the management of the property, along with his other co-owners, is not yet, in law, an impairment of his vested property rights. In this case (*Looker* v. *Maynard, 179 U. S. 46,* decided in the supreme court of the United States, in October

Term, 1900), the legislature, by an act subsequent to the charter
of a company, changed the power of cumulative voting, which
belonged to stockholders at the time of the passage of the act.
The supreme court held that this change in his voting right did
not impair the property right of a stockholder, and the decision
is carefully confined to a change of the right in that respect.
*Ibid. 54.*

In our state the supreme court has taken a different view
upon the question as to whether the voting right of stockholders,
as between themselves, which existed under charter or certifi-
cates is subject to alteration and repeal by the legislature, and
has held that it was not, because this voting power was a prop-
erty right. *In re Newark Library Association, 35 Vr. 217, 219
(1899).* But the court of errors and appeals, on the appeal in
the case, expressly withheld their decision upon this question,
and disposed of the case upon another point, *Ibid. 265.* In
reference to the rights which result to a stockholder from mem-
bership and property rights, the latest decision of our court of
appeals is the case of *German Mutual Fire Insurance Co.* v.
*Schwartzwaelder, 14 Dick. Ch. Rep. 589.* In that case an act of
the legislature was passed, after the incorporation of a mutual
fire insurance company, authorizing its conversion into a joint
stock company. As a member of the mutual insurance company,
defendant's rights arose from taking out an insurance policy.
This was a very small property right, and one which, by the
terms of the policy, was subject to termination upon the giving
of a notice of cancellation by the company. The court of errors
and appeals decided that the subsequent law authorizing the
change of the mutual company into a joint stock company was
a change of a substantial right of the member, who became, and
continued to be, such by reason of his policy, and was therefore
unconstitutional. A striking instance of the difference in the
operation of subsequent legislation upon the property rights
and upon the voting right appears in this very act of March
28th, 1902. By the first section two-thirds in interest of stock-
holders present at meetings were given the power which previously
belonged only to two-thirds of the whole stockholders, whether
present or not. Such subsequent regulations of the voting power

of stockholders of corporations under the General Corporation law have never been questioned. The second section is the change now under review, impairing what I consider to be the property right.

I think, therefore, the act of March 28th, 1902, being passed after the vesting of this property right of equal share on distribution of capital, had no effect to give an authority to make this change, and as this is the only legislative authority for the reduction of the preferred stock and the distribution of capital connected with the reduction, or for redemption and retirement of preferred stock out of the bonds in the manner proposed, the execution of the plan proposed for the distribution of capital must be enjoined, as against the complainant, unless she assents thereto. The act being unconstitutional for this reason, I do not consider or pass on the other ground of unconstitutionality urged, namely, that it is a special act conferring corporate powers. Part of this plan contemplates the issuing of bonds for the purpose of raising money for general corporate purposes, and the votes of the stockholders were taken separately upon that part of the plan. It has not been suggested that the $50,000,000 could not be raised, and no injunction in this case should at all affect that. This act of March 28th, 1902, authorizes the reduction or retirement out of bonds or the proceeds of bonds. The resolution of the directors was also that the retirement should be out of the bonds or proceeds of bonds; it included both methods. The only way in which this present plan comes to be restricted to a redemption out of the bonds alone, as distinguished from the proceeds of bonds, is the fact that, in connection with the resolution of the directors, there is also an approval of the contract with the bankers, and that in the contract with the bankers the only offer is that of a redemption out of the bonds. The only question now considered is the effect of a plan for redemption out of bonds, and the injunction will go only against issuance or delivery of any bonds under the bankers' contract, except the $50,000,000 bonds issuable and deliverable for cash subscriptions.

*Fourth.* The complainant had notice, on or about May 10th, 1902, of the adoptions of the resolutions of the directors ap-

proving the plan and of its submission to the stockholders, and on May 19th, 1902, had notice of its adoption by the stockholders. The delay of twenty days in applying for a preliminary injunction renders it proper, under the circumstances of the case, to direct that the preliminary injunction be issued upon the condition that if defendants desire to appeal from the order and to bring on the hearing of the appeal at the June Term of the court of errors and appeals, complainant will consent to the setting down of the appeal for hearing and bringing on the hearing at the June Term.